UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:20-cv-00401-MOC-DCK

| | | |
|---|---|---|
| **JOSHUA BROWN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| **WHOLE FOODS MARKET GROUP, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on a Motion for Summary Judgment by Defendant Whole Foods Market Group, Inc. ("Whole Foods"). (Doc. No. 22). Whole Foods moves for summary judgment on three of Plaintiff's claims: Plaintiff's Claim of intentional infliction of emotional distress, (Doc. No. 23 at 4–6); Plaintiff's Section 1981 Civil Rights Act Claim, (Id. at 6–8), and Plaintiff's Claim for punitive damages, (Id. at 8).

For the following reasons, the Defendant's Motion is **GRANTED** as to Plaintiff's Claim of intentional infliction of emotional distress. However, the Defendant's Motion is **DENIED** as to Plaintiff's Section 1981 Civil Rights Act Claim and Plaintiff's Claim for punitive damages to the extent that Plaintiff can still seek punitive damages on his Section 1981 claim. The Court finds that genuine issues of material fact exist as to these claims, so they cannot be resolved on a Motion for Summary Judgment.

**I.     Background**

Plaintiff initiated this action by filing a Complaint in Mecklenburg County Superior Court. (Doc. No. 1-1). Defendant removed the action to this Court. (Doc. No. 1-2). Plaintiff's Complaint concerns events which occurred on or about June 14, 2017 at Defendant's supermarket located at

1

Sharon Square in Charlotte, North Carolina. (Doc. No. 1-1 at 6). According to the Complaint, Plaintiff entered the supermarket and proceeded to the fish area, receiving some Maui-Maui fish from the employee there. (Id.). He then went to the section of the supermarket with hot food ready to eat and decided to get a slice of pizza. (Id.). Plaintiff alleges that at this supermarket, "the practice … for all customers ordering food from the bar area to diner is that the customer orders their food, take their order to the dine in area to eat and after, take their receipt to the counter to pay for their order." (Id.) Accordingly, Plaintiff proceeded to the dining area with his pizza and sat down to begin eating it. (Id.). Plaintiff alleges that "other customers" were doing the same thing with their food that day. (Id.).

Yet, Plaintiff alleges, when he proceeded to the dining area to being eating his food he was approached by supermarket manager Tim Burroughs, who asked Plaintiff to pay for his pizza before eating it. (Id. at 7). Plaintiff alleges that Burroughs did not make the same request of white customers in the dining area and that these customers were also eating their food prior to purchase, as Plaintiff alleges was the practice at this store. (Id.). Plaintiff alleges that Burroughs then "called 911 falsely accusing [Plaintiff] of acting suspicious and attempting to steal food from the store." (Id.).

Two Charlotte-Mecklenburg Police Department officers then arrived in response to Burroughs's call. (Id.). The officers informed Plaintiff that he was not violating any laws. (Id.). At this time, Plaintiff began recording his interaction with the police officers. (Id. at 8). Plaintiff alleges that one of the officers demanded he pay for this pizza prior to finishing it "in a provoking manner." (Id.). Plaintiff explained that he was not stealing, that he was following the store's practice, and that he would pay for his meal immediately after finishing it. (Id.). The officers then informed Plaintiff that if he left the store without paying for the pizza, he would be arrested for

2

stealing. (Id.). Plaintiff confirmed that he understood that this was the case. (Id.). Plaintiff then left the in-store dining area, tendered payment of the pizza and the Maui-Maui fish, and left the store. (Id.).

Plaintiff alleges that Burroughs is an agent of Defendant and that Defendant is vicariously liable for Burroughs's actions. (Id. at 5). Plaintiff further alleges that Burroughs's actions amounted to "denying [him] the enjoyment of all benefits, privileges, terms, and conditions that white customers enjoy while Shopping at Whole Foods," in violation of the Civil Rights Act of 1866. (Id. at 8); see 42 U.S.C. § 1981. Plaintiff alleges "emotional and psychological harm" as a result of Defendant's actions. (Id.). Plaintiff further alleges that Burrough's conduct amounted to "targeting and racial profiling" and that this, "compounded with calling [the police]," amounted to "extreme and outrageous conduct." (Id. at 9). Plaintiff alleges that this amounted to the tort of intentional infliction of emotional distress, and that he is entitled to recover damages for "mental anguish, sever[e] emotional distress, and post-traumatic stress." (Id.). Additionally, Plaintiff alleges that he is entitled to recover punitive damages because Defendant's actions were "reckless and wanton; and were performed in conscious disregard of and indifference to [his rights]." (Id. at 9–10).

Defendant moved for summary judgment on December 3, 2021, arguing that Plaintiff's claims should be dismissed because genuine issues of material fact did not exist. (Doc. Nos. 22, 23). Plaintiff responded under seal on January 13, 2022, (Doc. No. 37), and Defendant replied on February 3, 2022, (Doc. No. 42). The Court heard oral argument on the Motion on March 9, 2022. The Motion has been fully briefed and is ripe for disposition.

**II.     Standard of Review**

Rule 56 provides for Motions for Summary Judgment. On a motion for summary judgment,

the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a genuine issue for trial." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (citations omitted; emphasis in the original) (quoting FED. R. CIV. P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her

4

favor. Anderson, 477 U.S. at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id. at 252.

## III. Discussion

### a. Section 1981 of the Civil Rights Act

Defendant moves for summary judgment on Plaintiff's claim under Section 1981 of the Civil Rights Act of 1866. 42 U.S.C. § 1981 prohibits "'nongovernmental discrimination' against the right of 'all persons' to 'have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens.'" Jones v. Lowe's Cos., 845 F. App'x 205, 213 (4th Cir. 2021). The statute defines "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). That statute is implicated in situations where, for example, an individual is denied proper service at a restaurant on account of his race. See e.g., Acey v. Bob Evans Farms, Inc., 2014 WL 989201 at *3 (S.D.W.Va. Mar. 13, 2014); Lloyd v. Waffle House, Inc., 347 F. Supp. 2d 249, 252 (W.D.N.C. 2004). A plaintiff may support a claim under 42 U.S.C. § 1981 using either direct or circumstantial evidence. Direct evidence includes "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested . . . decision." Brinkley v. Harbour Recreation Club, 180 F.3d 598, 607 (4th Cir. 1999). When a plaintiff cannot show direct evidence of a discriminatory intent, courts analyze § 1981 discrimination claims using the McDonnell Douglas burden-shifting framework. Parks v. La.-Pacific Corp., 400 F. Supp. 3d 393, 412 (W.D.N.C. 2019) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).

To establish a claim of racial discrimination using circumstantial rather than direct evidence, a plaintiff must show that: (1) she is a member of a protected class; (2) she sought to

5

enter a contractual relationship with the defendant; (3) she met the defendant's ordinary requirements to pay for an receive goods or services ordinarily provided by the defendant to other similarly situated customers; and (4) she was denied the opportunity to contract for goods and services that were afforded to white customers. See Williams v. Staples, Inc., 372 F.3d 662, 667–68 (4th Cir. 2004); Edwards v. Waffle House, Inc., 2006 WL 8438427, at *7 (E.D.N.C. Mar. 27, 2006). The parties do not contest the first two elements.

Defendant argues that there are not genuine issues of material fact. Defendant characterizes Defendant's alleged treatment of Plaintiff as mere rudeness and argues that "rudeness does not 'rise to the level of a civil rights violation' and the '[l]aw does not blindly ascribe to race all personal conflicts between individuals of different races.'" (Doc. No. 23 at 7) (citing Edwards, 2006 WL 8438427 at *8)); see also Hawkins v. PepsiCo, Inc., 203 F. 3d 274, 282 (4th Cir. 2000). Defendant notes that there is no direct evidence that Burroughs treated Plaintiff differently on account of his race. (Id. at 7–8). Defendant also argues that "Plaintiff did not meet the ordinary and customary requirements of paying for goods before eating those goods" because Plaintiff did not adhere to Defendant's alleged policy of paying for food before eating it. (Id. at 7). Furthermore, Defendant notes that Plaintiff was, in fact, "able to obtain the piece of pizza he wanted at the store's hot bar, eat the pizza in the dining area, and check out at the registers." (Id.).

Plaintiff counters that there are genuine issues of material fact as to whether Defendant did, in fact, have a policy of requiring customers to pay before eating their food that was consistently enforced as to all customers. Burroughs testified that he had informed customers of the policy in the past, as he informed Plaintiff, but that he never called the police on those customers. (Doc. No. 37 at 10–11) (citing Burroughs Tr., pp. 46:4–18, 72:25–73:10). Plaintiff points out that Defendant's "General Information Guide"—a guide for Defendant's employees dealing with many

6

situations including "customer incidents"—does not mention such a policy. (Doc. No. 37 at 6, 11; see also Doc. No. 36 at pp. 40, 55). In addition, Plaintiff cites this Court for the authority that "a customer who enters a restaurant for service is contracting for more than just food. [Section 1981] encompasses 'the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.' Dining in a restaurant includes being served in an atmosphere which a reasonable person would expect in the chosen place." (Doc. No. 37 at 11) (citing Lloyd v. Waffle House, Inc., 347 F. Supp. 2d 249, 253–54 (W.D.N.C. 2004)).

The Court agrees with Plaintiff. Whether Plaintiff's allegations prove true, Plaintiff has alleged more than mere rudeness. Plaintiff has raised multiple factual bases upon which a reasonable trier of fact might find that Defendant did not have a policy of requiring customers to pay before eating, or that Defendant had but did not enforce such a policy and chose to selectively enforce the policy against Plaintiff in a discriminatory fashion. Moreover, Defendant has not presented compelling evidence that the policy existed and was enforced consistently. Therefore, there are genuine issues of material fact as to Defendant's policy and summary judgment would not be proper on this issue. In addition, the Court agrees with Plaintiff that there are factual questions as to whether Plaintiff received "the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." The Court affirms the reasoning in Lloyd and finds that, at a minimum, a reasonable trier of fact could conclude that Defendant affords a certain dining atmosphere to its customers and failed to provide that atmosphere to Plaintiff on account of his race.

In reply, Defendant further argues that Plaintiff's allegations are legally insufficient based on previous cases construing Section 1981. First, Defendant argues that "when a plaintiff is able to complete his purchase, a § 1981 claim cannot survive a dispositive motion." (Doc. No. 42 at 4)

(citing Lopez v. Target Corp., 676 F.3d 1230 (11th Cir. 2012); Baltimore-Clark v. Kinko's Inc., 279 F. Supp. 2d 695, 700 (D. Md. 2003)). The Court disagrees with Defendant. As Defendant explains, Lopez and Baltimore-Clark both involved retail stores where the plaintiffs were treated disrespectfully but were still ultimately able to complete their purchases. The Court finds that these cases are distinguishable because they concern retail stores rather than restaurants. Retail stores are arguably primarily in the business of selling goods and, unlike restaurants, do not necessarily seek to provide an experience or atmosphere. Therefore, in the retail context but not in the restaurant context (as here), there is a certain logic to the rule suggested by Defendants that a plaintiff who is able to complete her purchase should not be able to maintain an action because her freedom to contract was not impaired. The Court does not hold that this suggested rule is the rule in the retail context; rather, the Court declines to reach this question because it finds that restaurant contexts are distinguishable. For the reasons explained above (and by this Court in Lloyd), restaurants do provide an atmosphere or experience in addition to goods and services and a reasonable trier of fact could conclude that Defendant's dining area was like a restaurant in this respect. Because Burrough's behavior arguably harmed Plaintiff's enjoyment of this atmosphere or experience, there are genuine issues of material fact as to whether Plaintiff was able to enjoy the benefits of doing business with Defendant on an equal footing with white customers, as required by law.

Second, Defendant argues that "federal courts have held that when store management calls the police to investigate individuals, and those individuals are not arrested, can remain in the store, and ultimately complete their purchases, summary judgment is proper on a § 1981 claim." (Id. at 4) (citing Morris v. Office Max, Inc., 89 F.3d 411, 414 (7th Cir. 1996)). Defendant notes that this Court has previously found the reasoning in Morris to be persuasive. (Id. at 5) (citing Bobbitt by

Bobbitt v. Rage Inc., 19 F. Supp. 512 (W.D.N.C 1998)). The Court rejects this argument for similar reasons as above. The Court does not reach the question of whether Morris continues to be persuasive authority today. The Court simply finds that, because Defendant is arguably in the business of selling an atmosphere or experience, a reasonable trier of fact could conclude that Burrough's decision to call the police was unjustified and deprived Plaintiff of the benefits of doing business with Defendant on an equal basis with white customers, as Plaintiff alleges.

Defendant also discusses Bobbitt in detail. Bobbitt involved two sets of Plaintiffs: one set who alleged they were served more slowly than white patrons, whose claims were dismissed because they were ultimately served; and another set who were told to prepay for their food by police officers "because three African-American teenagers had left without paying the day before." Bobbitt, 19 F. Supp. at 514–19. Defendant attempts to analogize Plaintiff to the first set of Bobbitt plaintiffs and distinguish him from the second set "because there is no evidence that white patrons or other patrons were permitted to eat their food without prepaying." (Doc. No. 42 at 5). Defendant is mistaken. First, there is at least some evidence: Plaintiff's testimony that this was so, the lack of any reference to this policy in Defendant's General Information Guide, and testimony from Burroughs that customers had previously violated the policy without having the police called on them. Second, Defendant has not put forward compelling evidence that white patrons were not permitted to eat their food without prepaying. On this procedural posture, the Court considers only whether there is a genuine issue of material fact as to whether the white patrons at Defendant's store were required to prepay. The Court finds that there is. Therefore, summary judgment would be improper for this reason as well.

   b. **Intentional Infliction of Emotion Distress**

Defendant moves to dismiss Plaintiff's claim of intentional infliction of emotional distress.

The elements of a claim of intentional infliction of emotional distress are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause, (3) severe emotional distress." Holleman v. Aiken, 668 S.E.2d 579, 590 (N.C. Ct. App. 2008); Denning-Boyles v. WCES, Inc., 473 S.E.2d 38, 40–41 (N.C. Ct. App. 1996). Conduct is "extreme and outrageous" where it "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 354 (2004) (citing Briggs v. Rosenthal, 73 N.C. App. 672, 677 (1985)); accord Wilson v. Gaston Cty., 145 F. Supp. 3d 549, 560 (W.D.N.C. 2015).

When considering a claim of intentional infliction of emotional distress, "[i]t is a question of law for the court to determine, from the materials before it, whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery. However, once conduct is shown which may be reasonably regarded as extreme and outrageous, it is for the jury to determine, upon proper instructions, whether the conduct complained of is, in fact, sufficiently extreme and outrageous to result in liability." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 490-91, 340 S.E.2d 116, 121 (1986) (intentional refs omitted). In Hogan, the court considered an employee who "screamed and shouted at [a colleague], called her names, interfered with her supervision of [subordinate employees], and on one occasion threw menus at her." Id. at 493. The court concluded that this did not satisfy the "extreme and outrageous conduct" element and, thus, could not amount to intentional infliction of emotional distress as a matter of law. Id. at 494.

In this case, Plaintiff alleges that Burroughs asked him to pay for his food but did not ask other customers to pay, and subsequently called the police on him, as a result of his race. Defendant argues that this claim should be dismissed because, as in Hogan, the alleged conduct does not rise

10

to the level of "extreme and outrageous" conduct. (Doc. No. 23 at 4–6).

Plaintiff disagrees, contending that Burroughs's conduct was, in fact, "extreme and outrageous" as a form of racial discrimination. (Doc. No. 37 at 14–18). As evidence for this proposition, Plaintiff cites Shumate v. Twin Tier Hospitality, LLC, 655 F. Supp. 2d 521, 542 (M.D. Pa. 2009) and Green v. Am. Broad. Cos., 647 F. Supp. 1359, 1362 (D.D.C. 1986). Shumate involved an African-American family that was denied overnight accommodations at a hotel, and Green involved the alleged harassing and discriminatory treatment of an employee by her employer on the basis of her race and sexual orientation. Plaintiff interprets Shumate to hold that "[w]hile it would be incorrect to assert that racial discrimination is per se extreme and outrageous, it is equally incorrect to suggest that racial discrimination cannot constitute extreme and outrageous behavior for the purposes of an [intentional infliction of emotional distress] claim." (Doc. No. 37 at 15–16) (citing Shumate, 655 F. Supp. 2d at 542).

The Court agrees with Plaintiff's interpretation of Shumate, but it disagrees with Plaintiff that his allegations state a claim for intentional infliction of emotional distress. First, at oral argument, counsel for Plaintiff essentially propounded the argument that conduct violating the Civil Right Act amounts to "extreme and outrageous" conduct because the Civil Rights Act prohibits racial discrimination and such discrimination is beyond all possible bounds of decency in our society. In so arguing, counsel for Plaintiff appears to be contradicting his own interpretation of Shumate, which, as Plaintiff argued, held that "it would be incorrect to assert that racial discrimination is per se extreme and outrageous." (Doc. No. 37 at 15–16) (citing Shumate, 655 F. Supp. 2d at 542)).

Moreover, Plaintiff states that "[i]n essence, Defendant's argument is that such racial profiling and discrimination does not exceed the bounds of decency and is not considered utterly

11

intolerable in our civilized society." (Doc. No. 37 at 15). While the Court agrees that the Civil Rights Act forbids racial discrimination and that such discrimination is indecent and morally abhorrent, the Court finds Plaintiff misinterprets the tort of intentional infliction of emotional distress and especially the "extreme and outrageous" element. Intentional infliction of emotional distress is not a broad overlay on top of existing statutes that already prohibit conduct condemned as indecent and immoral by society. Rather, the intentional infliction of emotional distress tort exists to provide a remedy in the narrow, highly unusual circumstances where a plaintiff is the victim of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Smith-Price, 164 N.C. App. at 354. To be sure, such conduct can violate existing statutes, as the court in Shumate noted. But the mere fact that a statute condemning a moral wrong was violated does not suffice to meet the "extreme and outrageous" prong of intentional infliction of emotional distress.

Rather, in assessing whether conduct was "extreme and outrageous," the Court's inquiry is limited to the alleged tortfeasor's specific conduct. As Plaintiff notes, "context matters" for this determination. (Doc. No. 37 at 15) (citing Mann v. Bahi, 242 F. Supp. 3d 6, 11 (D.D.C. 2017) (collecting District of Columbia cases)). But contrary to Plaintiff's insinuation that the Court should look to national public policy issues in determining "context," the many cases cited by the Mann court (applying District of Columbia law) suggest that "context" involves the normal meaning of that word, namely factors such as "applicable community standards," "the relation between the parties," and "the particular environment where the conduct took place" and not national public policy issues, no matter how pressing. Id. (citing King v. Kidd, 640 A.2d 656 (D.C. 1993)). Plaintiff's interpretation of "context" goes far beyond anything supported by Plaintiff's

own case, which in any case concerns District of Columbia law. The Court is not aware of any North Carolina case (or, for that matter, District of Columbia case) which endorses such a capacious interpretation of "context" in construing "extreme and outrageous" conduct. The Court declines to do so here.

For the Court to consider public policy issues in construing "extreme and outrageous" conduct would essentially usurp the legislative branch's purview to address such issues through legislation—as Congress did with the passage of the Civil Rights Act of 1866 and in numerous subsequent enactments. This is likely the reason that the conduct covered by intentional infliction of emotional distress is so narrow: because it proscribes conduct so extreme, atrocious, and "utterly intolerable" that the legislative branch may not always have occasion to address it by statute. As pressing as the issue of continued racial discrimination in this country surely is, the remedy is through enforcement of existing statutes and potential enactment of additional statutes by Congress, not through expanding longstanding common law torts beyond recognition.

Therefore, even accepting Plaintiff's allegations as true and considering the relevant context, the alleged conduct in this case (of asking a customer to pay for food at an earlier time than other customers and calling the police without justification) does not clear the very high bar of "extreme and outrageous" conduct. As Defendant notes, this is confirmed by Plaintiff's own account of the incident. (Doc. No. 42 at 2–3). According to Plaintiff, Burroughs approached Plaintiff with polite language. (Id.). When the police arrived, there is no indication that Burroughs misrepresented the situation to them; rather, they appear to have understood that Plaintiff had not committed a crime and the only issue was whether Plaintiff was going to pay for the food he was eating, which he had refused to do when asked by Burroughs. (Id.) The Court finds that this is simply not "extreme and outrageous" as understood by courts in the context of intentional

13

infliction of emotional distress.

If Burroughs's conduct was motivated by Plaintiff's race or amounted to unequal access to Defendant's services, it would appear to fall squarely within Congress's prohibition in the Civil Right Act of 1866. But this does not mean that it was intentional infliction of emotional distress. As the Court in Shumate noted, conduct could be both "extreme and outrageous" and in violation of the Civil Rights Act. For instance, if Burroughs had misled the police and caused them to forcibly arrest Plaintiff, or if Burroughs publicly addressed Plaintiff using a racial slur or other extremely deplorable and abusive language, then Defendant's conduct would appear to violate both the intentional infliction of emotional distress tort and the Civil Rights Act of 1886. But the conduct alleged here, taking Plaintiff's allegations as true for purposes of this motion, simply does not rise to that level.

The intent prong of intentional infliction of emotional distress bolsters this conclusion. Defendant argues that Burroughs did not intend to cause harm to Plaintiff, as required by the second element of IIED. For its intent argument, Defendant cites Hensley v. Suttles, a case in which deputies shot the plaintiffs' father in front of them but, because the plaintiffs could not provide any evidence that the deputies intended to cause them severe emotional distress, the court dismissed the claim of intentional infliction of emotional distress. 167 F. Supp. 3d 753, 768 (W.D.N.C. 2016); (Doc. No. 23 at 5). The Hensley court held that there was no evidence Plaintiffs had animosity towards Defendants, which "could be viewed as a calculated effort to strike fear in [their] hearts." Id. at 768–69. Defendant argues that if the conduct in Hensley and Hogan was not "intentional" under the intentional infliction of emotional distress tort, then the conduct here cannot be because there is no evidence that Burroughs intentionally sought to cause emotional harm to Plaintiff. The Court agrees.

14

Plaintiff counters that this prong can be met by showing a "reckless indifference to the likelihood" of "severe emotional distress." (Doc. No. 37 at 16–17) (citing Russ v. Great Am. Ins. Cos., 464 S.E.2d 723, 726 (N.C. Ct. App. 1995) (characterizing sexual harassment as "reckless" as to "severe emotional harm" because of "the high probability and substantial certainty that harm will result from [it]")). Here, Plaintiff focuses his argument on Defendant's decision to call the police which, Plaintiff suggests, demonstrated a reckless indifference to the likelihood of causing "severe emotional distress" to Plaintiff. Taking as true Plaintiff's arguments that calling the police was unjustified and that Plaintiff was emotionally disturbed by the police, Plaintiff still fails to plausibly allege intentionality as understood under North Carolina law. If the Hensley plaintiffs' father being shot by deputies in front of them does not amount to intentionality or recklessness as to emotional harm, then Burroughs's decision to call the police and tell them that Plaintiff was "acting weird" and might be on the verge of committing a petty crime cannot suffice to establish recklessness.

Even drawing all factual inferences in his favor, Plaintiff has not cleared the very high legal bars necessary to establish "extreme and outrageous conduct" and intentionality, two of the three prongs of a claim of intentional infliction of emotional distress. Accordingly, Plaintiff cannot maintain such a claim and Defendant is entitled to summary judgment on this claim.

### c. Punitive Damages

In the Complaint, Plaintiff asserted punitive damages as a claim for relief. (Doc. No. 1-1 at 9–10). Defendant moves to dismiss this purported claim for relief, arguing that punitive damages are a remedy, not a "separate, viable claim." (Doc. No. 23 at 8) (citing Ward v. Autozoners, LLC, 958 F.3d 254, 269 (4th Cir. 2020)). Plaintiff now concedes that this was "unartful" because "there is no dispute that punitive damages are a remedy and not a standalone cause of action." (Doc. No.

37 at 18, n.2) (citing Landmar, LLC v. Wells Fargo Bank, N.A., 978 F. Supp. 2d 552, 571 (W.D.N.C. 2013)). The parties are correct. Punitive damages are a remedy, not a cause of action in and of themselves. The Court leaves open the possibility of punitive damages as a remedy. See Lloyd, 347 F. Supp. 2d at 256 ("It would also be inappropriate to foreclose a particular type of damages at summary judgment, especially in the face of so many disputed factual issues and credibility/intent determinations").

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 22) is **GRANTED** as to Plaintiff's Claim of intentional infliction of emotional distress, but the Motion is **DENIED** as to Plaintiff's Section 1981 Civil Rights Act Claim and Plaintiff's potential remedy of punitive damages on this claim.

Signed: March 25, 2022

Max O. Cogburn Jr
United States District Judge